IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEPHEN BUCKLEY, | : | 1:13-cv-2022 |
| | : | |
| Plaintiff, | : | Hon. John E. Jones III |
| | : | |
| v. | : | |
| | : | |
| STATE CORRECTIONAL INSTITUTION- | : | |
| PINE GROVE and PENNSYLVANIA | : | |
| DEPARTMENT OF CORRECTIONS, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

### April 13, 2015

This matter involves an apparently novel legal question arising at the intersection of a student's right to a free appropriate public education under the Individuals with Disabilities Education Act ("IDEA") and a correctional institution's legitimate interest in security and prison management. Specifically, we are tasked to interpret the strictures of 20 U.S.C. § 1414(d)(7)(B), which allows certain incarcerated students' Individualized Education Programs to be modified where the state proves a bona fide security interest that cannot otherwise be accommodated. The action is before us on the parties' cross motions for judgment on the supplemented administrative record. (Docs. 36, 38).

1

## I.   BACKGROUND[1]

Plaintiff is 21 years old (born  October 8, 1993) and at all times relevant to

this matter was incarcerated at SCI-Pine Grove, a young adult offender institution.

(Doc. 17-2, pp. 6, 7).  He is diagnosed with Attention Deficit Hyperactivity

Disorder and an Emotional Disturbance (*id.* at p. 6), and has been identified as

eligible for services under the IDEA.  (*Id.* at p. 2).  As required by the statute,

various Individualized Education Programs ("IEPs") have been developed for

Plaintiff for the delivery of special education and related services.  (*Id.* at p. 6); *see*

20 U.S.C. § 1414(d)(1)(A).

The IEP in place before Plaintiff was incarcerated at SCI-Pine Grove was

dated May 8, 2009, and developed while he was in the custody of Lackawanna

County Prison.  (J2).  Pertinently, the IEP included a description of Plaintiff's

then-present levels of academic achievement and functional performance based on

recent testing.  (J2, pp. 4-5); *see* 20 U.S.C. § 1414(d)(1)(A)(i)(I).  The program

stated annual academic goals in math computation and reading fluency, and a

functional goal related to transitioning between activities.  (J2, pp. 10-12); *see* 20

---

[1] The factual background is derived from the administrative Hearing Officer's findings of
fact, which must be considered as "prima facie correct" from the outset.  *S.H. v. State-Operated
Sch. Dist. of City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003).  After a thorough review, we find
the below recitation fully supported by the record, noting in any event that the gravamen of the
parties' dispute is legal and not factual.

U.S.C. § 1414(d)(1)(A)(i)(II).  The academic objectives were to be measured by "progress monitoring," and his functional goal was to be tracked by documenting his class participation and conduct, with progress on all goals to be reported quarterly.  (J2, pp. 10-12); *see* 20 U.S.C. § 1414(d)(1)(A)(i)(III).  The IEP also listed numerous program modifications and specially designed instructions ("SDI").  (J2, p. 13); *see* 20 U.S.C. § 1414(d)(1)(A)(i)(IV).[2]  Under the IEP, Plaintiff received one hour per day of education with one hour of supplemental services.  (J2, p. 15).  In terms of classes, he was enrolled in Math, English, Science, and History. (*Id.*).

While incarcerated at the Lackawanna County Prison, Plaintiff received services in accordance with his IEP.  (Doc. 17-2, p. 6).  On December 11, 2009, he was sent to the Diagnostic and Classification Center of the Pennsylvania Department of Corrections ("DOC") at SCI-Camp Hill.  (*Id.*).  Within three weeks of his arrival, Plaintiff was placed in SCI-Camp Hill's Restricted Housing Unit ("RHU"), a section of the prison housing inmates with disciplinary infractions. (*Id.* at pp. 6-7).  On February 2, 2010, Plaintiff was transferred to SCI-Pine Grove,

---

[2]  Specifically, the prescribed program modifications and SDI were: "Cue student to remain on task; extended time; reduced number of choices; word bank provided for fill in the blanks; no more than one essay; not penalized for spelling errors except for spelling tests; restating of directions.  Extended time for assignments; shortened assignments when appropriate. Priority seating; no cursive from teacher given to Stephen."  (P2, p. 13).

apparently directly into that institution's RHU. (*Id.* at p. 6).

Inmates in SCI-Pine Grove's RHU spend 23 hours per day in their cells. (*Id.* at p. 7). Each cell is approximately 8' by 10', with a cot, desk, chair, toilet, and sink, all furnishings being secured to the building structure. (*Id.*). Cell doors are of solid metal with a small window and a food tray aperture (sometimes called a "pie slot"). (*Id.*). Some RHU inmates are double-celled, but Plaintiff did not have a cell mate. (*Id.*). The RHU is cacophonously loud at all hours. (*Id.* at p. 9). Inmates are permitted exercise five days a week for one hour and get showers throughout the week. (*Id.* at p. 7). They may also be transported from their cells, for example, to receive visitors, medical assistance, or counseling. (*Id.*). A specific protocol is followed every time an RHU inmate is removed from his cell: two officers handcuff the inmate behind the back through the cell's tray aperture, and they open the door only after the inmate is handcuffed. (*Id.*). RHU inmates are always escorted by two officers. (*Id.*).

Plaintiff has committed multiple assaults and other rule infractions, resulting in his continued, restrictive detention. (*Id.* at pp. 7-8). Specifically, Plaintiff has engaged in assaultive behavior on at least four occasions, including on January 2, 2010, July 27, 2010, November 2, 2010, and December 23, 2010. (*Id.* at p. 8). He has engaged in other serious misconduct on approximately 25

separate occasions, such as threatening prison personnel or their families,

destroying property, refusing to obey orders, and possessing contraband. (*Id.*).

Plaintiff has used writing paper to cover the windows and tray aperture in his cell,

creating an extremely dangerous situation for guards needing to enter. (*Id.*).

Because of this conduct, Plaintiff's paper and writing utensil privileges were

discontinued. (*Id.*). Plaintiff has also taken his tray aperture "hostage" by placing

his arms through the slot, rendering it impossible for officers to secure the tray

door. (*Id.*).

Each inmate's confinement in the RHU is reviewed every 30 days by a

Program Review Committee ("PRC") consisting of prison officials. (*Id.* at p. 9).

The PRC reviewed Plaintiff's case at least three times and determined that

Plaintiff was properly placed in the RHU on each occasion. (*Id.*). It appears that

Plaintiff essentially spent the duration of his incarceration at SCI-Pine Grove in

the RHU, amounting to a period of not days or months but years.

In terms of education, three IEPs were developed for Plaintiff while at SCI-

Pine Grove (the "SCI-Pine Grove IEPs"). (J5, J8, J10).[3]  The first IEP, dated June

8, 2010, stated Plaintiff's present academic level based on one test administered at

---

[3] The Hearing Officer stated that two IEPs were developed for Plaintiff while at SCI-Pine Grove, dated June 8, 2010, and February 14, 2012. (Doc. 17-2, p. 9). However, the Court notes in the record an additional, intervening IEP dated February 1, 2011. (J8).

SCI-Camp Hill on February 2, 2010.  (J5, p. 5).  It explained that, because Plaintiff was then housed in the RHU, there were no current classroom observations and represented that Plaintiff "receives cell study one time per week which he has been consistently completing."  (*Id.*).  In terms of functional needs, the IEP noted that Plaintiff "needs to follow institutional rules so that he can be transitioned into the general population where he can attend school."  (*Id.*).  The IEP included no academic goals and one functional goal, namely that Plaintiff "will comply to [sic] all rules, regulations, and academic requests while in the restricted housing unit and/or transition."  (*Id.* at p. 10).  Progress was to be measured by discussion and observation and reported on Plaintiff's IEP form and through quarterly report cards.  (*Id.*).  As the Hearing Officer observed, the goal has no baseline and is not objectively measurable, unless of course Plaintiff was 100% compliant all of the time.  (Doc. 17-2, p. 9).  The IEP contained the following modifications and SDI: Feedback, Monitoring, and Modification to materials when needed.  (J5, p. 11). The parties stipulated that the second IEP, dated February 1, 2011 (J8), and the third IEP, dated February 14, 2012 (J10), were virtually identical to the first IEP. (NT 125, 126).  Before implementing the second IEP, SCI-Pine Grove issued a Reevaluation Report ("RR") on December 27, 2010, which did not contain new assessment data but relied on the single test administered at SCI-Camp Hill more

than one year prior.  (Doc. 17-2, p. 9).  In the words of the Hearing Officer, the

"[r]ecommendations to the IEP team [were] conclusory, generic, and have no

bearing whatsoever on the actual services that [Plaintiff] may have needed or was

likely to have received at the time."  (*Id.*).

Throughout his time in the RHU, pursuant to the prison's general policy for

RHU inmates, Plaintiff received only in-cell study.  Although SCI-Pine Grove has

a school, which includes several classrooms and a gymnasium and provides

special education services to eligible students, the inmates confined in the RHU

are not permitted to attend.  (*Id.* at pp. 7, 8).[4]  Instead, a teacher would provide

"self study packets" to Plaintiff through the tray aperture in his cell door.  (*Id.* at p.

8).  The Hearing Officer found, and the parties do not dispute, that the packets

were not individualized to Plaintiff.  (*Id.* at p. 9).[5]  Without opening the cell door,

the teacher would remain outside of Plaintiff's cell to answer any questions.  (*Id.*

at p. 8).  However, Plaintiff was not obligated to and did not complete the packets

and seldom spoke with the teacher.  (*Id.*).  In any event, the usual noise level in the

---

[4]  Parenthetically, SCI-Pine Grove's school principal testified that, at any given time, there are approximately 15 to 18 special education students housed in the RHU, which amounts to about 25% of the prison's special education population.  (NT 176).  In addition, the RHU generally houses another 10 to 15 general education students.  (*Id.*).

[5]  Defendants, however, emphasize that the packets were "individualized for his educational level."  (Doc. 39, p. 9 (emphasis omitted)).

RHU is so loud as to impede any attempt at instruction. (*Id.* at p. 9 & n.5; NT 27-28).  No additional educational or related services were provided to Plaintiff or any other student in the RHU.  (Doc. 17-2, p. 9).

Plaintiff submitted a due process complaint on October 16, 2012, centrally challenging that he was being denied a free appropriate public education ("FAPE").  He demanded compensatory education for the denial of a FAPE, an order to provide a FAPE going forward, and an independent educational evaluation ("IEE").  On March 22, 2013, a due process hearing was conducted, and a decision was rendered on May 1, 2013.  (*Id.* at p. 1).

The Hearing Officer ruled that the educational services offered to Plaintiff did not violate the IDEA.  He concluded that, pursuant to 20 U.S.C. § 1414(d)(7)(B), SCI-Pine Grove had demonstrated "a bona fide security or compelling penological interest that cannot otherwise be accommodated," and that Plaintiff's IEP was permissibly modified accordingly.  (*Id.* at p. 13 (quoting 20 U.S.C. § 1414(d)(7)(B))).  Specifically, the Hearing Officer found the existence of a bona fide security interest, describing that, "despite the extreme precautions taken with all inmates in the RHU, the Student is a constant security risk[,] . . . manag[ing] to commit assaults even with the RHU protocols in place."  (*Id.*).  The Hearing Officer rejected Plaintiff's argument that RHU protocols appropriately

accommodated any security concerns and that Plaintiff could be safely removed from his cell in accordance with RHU procedures in order to receive one-on-one special education services. (*Id.*). While such contention may be compelling in the abstract, the Hearing Officer reasoned, the security risk particular to Plaintiff militated against frequently removing him from his cell as he advocated. (*Id.*).

The Hearing Officer further disagreed with Plaintiff's argument that his IEP was not "modif[ied]" within the meaning of the statute but, rather, completely eliminated. The ruling provided the following rationale:

> [The Student's] IEP does not come remotely close to satisfying the § 1414(d)(1)(A) requirements [for the content of an IEP] but, since the § 1414(d)(7)(B) exception is triggered, it does not have to. Said differently, the Student argues that he is still entitled to a FAPE even if the 1414(d)(7)(B) exception is triggered. . . . [H]owever, the exception exempts SCI-Pine Grove from the requirement to provide an IEP that includes special education and related services. This is the foundation upon which FAPE stands. I must find that, as a matter of law, whenever [a local educational agency] is not required to provide an IEP, it is not required to provide a FAPE.

(*Id.* at p. 13). To clarify, the Hearing Officer expressed that Plaintiff's IEP did not comply with IDEA standards and that Plaintiff received absolutely no special education, specially designed instruction, or related services, but that this failure – though a great disservice to Plaintiff – did not violate the IDEA. (*Id.* at p. 14).

In light of the security-interest exception, the Hearing Officer denied Plaintiff's demand for compensatory education and a FAPE. (*Id.*). However, he found that such exception does not negate SCI-Pine Grove's duty to evaluate Plaintiff in accordance with the IDEA. (*Id.*). Observing that the prison had failed to appropriately evaluate Plaintiff, the Hearing Officer ordered an IEE consisting of a Neuropsychological Evaluation, Functional Behavioral Assessment, and Psychiatric Evaluation. (*Id.* at p. 16).

## II.   PROCEDURAL HISTORY

Plaintiff commenced the present action with the filing of a Complaint on July 29, 2013 (Doc. 1), appealing the Hearing Officer's decision and alleging violations of the IDEA, Section 504 of the Rehabilitation Act, as amended, 29 U.S.C. § 794 ("RA"), and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"). Plaintiff contends that the Hearing Officer erred in concluding that Plaintiff's IEP was appropriately modified under § 1414(d)(7)(B) of the IDEA and in reasoning that SCI-Pine Grove was not obligated to provide him with a FAPE. (*Id.* ¶ 4). Plaintiff centrally requests an award of compensatory education; a declaration that SCI-Pine Grove's actions violated the IDEA, RA, and ADA;

attorney's fees and costs; and compensatory damages. (*Id.* at pp. 21-22).[6]

On November 15, 2013, Plaintiff filed a Motion to Submit Additional Evidence (Doc. 18), seeking to admit two documents to supplement the administrative record:  the IEE performed by Dr. Steven Kachmar, ordered by the Hearing Officer and dated October 15, 2013, and Plaintiff's Inmate Cumulative Adjustment Records ("ICAR"), dated October 17, 2013.  The IEE is a 42-page report purposed to establish "additional information related to [Plaintiff's] cognitive abilities, academic strengths and weaknesses, as well as his current social, emotional, and behavioral functioning." (Doc. 20-1, p. 2).  The report describes that the psychologist conducted the evaluation on September 14, 2013, in a secure visiting area, through safety glass and by way of telephone. (*Id.* at p. 9).  The evaluation includes a summary of Plaintiff's psychological and educational history; observations from the psychological/educational assessment; the results of that assessment; and recommended changes to Plaintiff's IEP to be considered by his IEP Team.  Dr. Kachmar recommended that the goals of Plaintiff's IEP should focus on the development of academic skills in the areas of reading, reading fluency, reading comprehension, math calculation, math problem-

---

[6]  Plaintiff also had asked for an order directing SCI-Pine Grove to provide him with a FAPE.  As Plaintiff notes in his supporting memorandum, he has since been released from prison, and thus, his request for future appropriate programming is moot.  (Doc. 37, p. 7 n.5).

solving, and written expression; that Plaintiff should receive direct instruction in all identified areas of academic need; that the IEP should incorporate SDI, modifications, and accommodations that appropriately address Plaintiff's cognitive weaknesses and learning style; and that Plaintiff should be provided with a supplemental level of emotional support services. (*Id.* at p. 33). Of note, Dr. Kachmar also recommended that Plaintiff's education be provided in a separate and secure area of the institution, such as the one used to conduct the IEE, and opined that such instruction could be furnished while maintaining the safety of teachers, other inmates, and correctional officers. (*Id.*).

Plaintiff's ICAR (Doc. 20-2) documents various interactions between Plaintiff and prison personnel occurring between January 8, 2013, and October 16, 2013. Relevantly, some of the entries note that Plaintiff was transported out of his cell (*e.g.*, in order to meet with a psychologist).

In a Memorandum and Order filed on January 6, 2014 (Doc. 24), we granted the motion and admitted the evidence. We reasoned that the IEE was non-cumulative, especially in light of its recency, and that it was relevant to the appropriateness of Plaintiff's IEP. In allowing the report, we explicitly permitted Defendants to submit rebuttal evidence in the form of expert reports. We found Plaintiff's ICAR germane to his argument that he could be safely removed from

his cell for educational purposes.

On February 4, 2014, Defendants filed the expert reports and curricula vitae of Dr. Robert Marsh, the DOC's Chief Psychologist, and Eric Bush, Superintendent of SCI-Pine Grove. (Doc. 25). Dr. Marsh's report does not dispute the legitimacy of the tests conducted by Dr. Kachmar or the corresponding results, but does contend that Dr. Kachmar is not qualified to opine on security matters, namely whether educational services could be provided to Plaintiff in the prison visiting room. (Doc. 25-1, p. 2). Rather, based on his expertise as a psychologist and prison administrator, Dr. Marsh opines that IEP-related services could not be provided to Plaintiff in the visiting area. (*Id.*). Mr. Bush's submission represents, among other things, that there is no difference between the educational services that could be provided in the visiting room and those that could be provided at the cell door, noting that Plaintiff is not shackled in his cell. (Doc. 25-2, p. 2). He relates that anytime Plaintiff is removed from his cell, it increases the danger to staff and other inmates, and that transporting Plaintiff requires two dedicated officers, excessively tying up personnel. (*Id.*). He also states that the visiting room is a dedicated meeting space and would be inappropriate for educational purposes, explaining that teachers would have to communicate with students by telephone, which would be overheard by others in

13

the visiting room, and that the conversations of inmates and their visitors would disrupt the learning process.  (*Id.* at pp. 2-3).

On February 21, 2014, Plaintiff filed a Motion to Submit Verifications in Rebuttal to Defendants' Expert Reports and Curriculum Vitae of Dr. Steven Kachmar and for Court to View Facility.  (Doc. 26).  We denied the motion to the extent it sought to submit two verifications, finding those submissions substantially cumulative of record evidence.  (Doc. 32).  We also declined the invitation to view the facility at SCI-Pine Grove, but allowed the curriculum vitae of Dr. Kachmar to be submitted.

Plaintiff filed the presently-pending Motion for Judgment on the Supplemented Administrative Record on September 26, 2014 (Doc. 36), and Defendants filed a Cross Motion for Judgment on the Supplemented Administrative Record on November 10, 2014 (Doc. 38).  Both motions have been appropriately briefed.  (Docs. 37, 39, 43).[7]

Later, the parties filed two additional motions.  Defendants submitted a Motion to Strike (Doc. 44), which sought to eliminate from the record an

---

[7] Plaintiff filed a supporting brief on September 26, 2014.  Defendants filed a hybrid brief in opposition to Plaintiff's motion and in support of Defendants' cross-motion on November 10, 2014.  Plaintiff thereafter filed a hybrid reply and brief in opposition on December 15, 2014.

attachment filed along with one of Plaintiff's memoranda, and Plaintiff filed a

Motion for Court to Take Judicial Notice of Public Document (Doc. 47),

specifically, a settlement agreement entered into by the DOC in a different civil

action.  We issued a Memorandum and Order on March 30, 2015, denying

Defendants' motion and granting Plaintiff's motion.  (Doc. 52).

## III.   STANDARD OF REVIEW

In general, under the IDEA, a party aggrieved by the factual findings and

decision rendered after a due process hearing has the right to file a civil action.

*See* 20 U.S.C. § 1415(i)(2)(A).  In conducting such proceeding, the statute states

that "the court – (i) shall receive the records of the administrative proceedings; (ii)

shall hear additional evidence at the request of a party; and (iii) basing its decision

on the preponderance of the evidence, shall grant such relief as the court

determines is appropriate."  *Id.* § 1415(i)(2)(C).

District courts review the administrative decision under "a nontraditional

standard of review, sometimes referred to as 'modified de novo' review."  *D.S. v.*

*Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010).  Applying this standard,

courts  must give "due weight" to the factual findings of the hearing officer.

*Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 268 (3d Cir. 2012).  This means that the

hearing officer's factual rendering is considered "prima facie correct," and the

district court must explain any disagreement therewith.  *Id.*  Where the court hears additional evidence, the court may accept or reject the hearing officer's findings "depending on whether those findings are supported by the new, expanded record and whether they are consistent with the requirements of the Act."  *S.H.*, 336 F.3d at 270 (quoting *Oberti v. Bd. of Educ.of the Borough of Clementon Sch. Dist.*, 995 F.2d 1204, 1220 (3d Cir. 1993)) (internal quotation marks omitted).  The "due weight" standard prevents a district court from imposing its own view of educational policy on the states.  *See Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982); *see also Fuhrmann v. East Hanover Bd. of Educ.*, 993 F.2d 1031, 1034 (3d Cir. 1993).

We review a hearing officer's legal conclusions *de novo*.  *See Jana K. ex rel. Tim K. v. Annville-Cleona Sch. Dist.*, 39 F. Supp. 3d 584, 594 (M.D. Pa. 2014).

## IV.   DISCUSSION

### A.   Statutory framework

The IDEA fundamentally ensures that all students with disabilities receive a free appropriate public education.  20 U.S.C. § 1412(a)(1).  FAPE encompasses "educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child

to benefit from the instruction." *Rowley*, 458 U.S. at 188-89 (internal quotation marks omitted); *D.S.*, 602 F.3d at 556.  States are not required to provide an education to each student maximizing his potential, but they must afford students the opportunity for "significant learning" and "meaningful benefit." *D.S.*, 602 F.3d at 556 (quoting *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 247 (3d Cir. 1999)) (internal quotation marks omitted).  To the extent possible, the IDEA requires that students with disabilities be educated in the "least restrictive environment," meaning together with children who are not disabled.  20 U.S.C. § 1412(a)(5); *see S.H.*, 336 F.3d at 265.

The individualized education program is the primary means of implementing a FAPE.  *See Honig v. Doe*, 484 U.S. 305, 311 (1988).  "Each IEP must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide." *M.R.*, 680 F.3d at 269 (quoting *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005)) (internal quotation marks omitted); *see* 20 U.S.C. § 1414(d)(1)(A).  At a minimum, an IEP must be reasonably designed to deliver meaningful educational benefits considering the student's intellectual capacity.  *See Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 182 (3d Cir. 2009) (citing *Shore Reg'l High Sch. Bd. of*

*Educ. v. P.S.*, 381 F.3d 194, 198 (3d Cir. 2004)).  For students 16 years-old and

older, the IEP must include transition assessment to facilitate transition into post-

secondary education or employment.  *See* 20 U.S.C. § 1414(d)(1)(A)(i)(VIII).  The

state must review the child's IEP at least annually to ensure that goals are being

met and to revise the IEP as appropriate.  *See id.* § 1414(d)(4)(A).

However, the IDEA carves out specific exceptions for students convicted as

adults under state law and incarcerated in adult institutions.  *See id.* § 1414(d)(7).

Specifically, these students are exempt from participation in general assessments

and, in some cases, transition planning and services.  *See id.* § 1414(d)(7)(A).  In

addition, and centrally in issue here, the IDEA permits a student's IEP to be

modified in light of certain demonstrated safety or penological considerations.

Section 1414(d)(7)(B) states as follows:

> If a child with a disability is convicted as an adult under
> State law and incarcerated in an adult prison, the child's
> IEP Team may modify the child's IEP or placement
> notwithstanding the requirements of sections
> 1412(a)(5)(A) of this title [requiring education in the
> least restrictive environment] and paragraph (1)(A)
> [relating to the content of IEPs] if the State has
> demonstrated a bona fide security or compelling
> penological interest that cannot otherwise be
> accommodated.

*Id.* § 1414(d)(7)(B) (footnote omitted).

18

We turn now to the application of 20 U.S.C. § 1414(d)(7)(B) to the case *sub judice*.

## B.    Section 1414(d)(7)(B) exception

Here, Plaintiff challenges the administrative decision's § 1414(d)(7)(B) analysis on two primary bases:  he argues that his IEP was not "modif[ied]" within the meaning of the statute and, also, that any security concerns could have been "otherwise . . . accommodated."  He asserts that the term "modify" is clear and unambiguous, meaning "to alter partially" or "to amend."  Noting the Hearing Officer's finding that Plaintiff's IEP included "*no* special education, specially designed instruction, or related services," (Doc. 17-2, p. 14 (emphasis in original)), Plaintiff believes that his special education program was not "modified" but completely eliminated in contravention of the plain language of the statute.  He argues that in-cell study is inadequate and akin to no educational offering at all, describing that the packets were not individualized to him, that teachers were only available once or twice per week, and that, even then, teachers could not effectively teach a lesson from outside a solid door in a cacophonously loud cell block.

Plaintiff also argues that SCI-Pine Grove could deliver special education services outside of his cell while still maintaining necessary security.  As

evidence, he points to the multiple occasions he has been safely escorted outside of his cell, *e.g.*, for medical, dental, and psychiatric care.  Further, SCI-Pine Grove's school principal and also its psychologist testified that "theoretically" Plaintiff could receive special education services outside of his cell but that the protocol for RHU inmates precluded the possibility.  (NT 136, 201).  Plaintiff emphasizes that this admonition demonstrates that his IEP was not adjusted based on a security concern particular to him, but instead because of a blanket policy mandating cell study for all RHU inmates.  Plaintiff additionally notes Dr. Kachmar's opinion that Plaintiff could safely be provided direct instruction in a separate and secure area of the correctional institution.  (Doc. 20-1, pp. 8, 33).

In terms of legal authority, Plaintiff cites *Handberry v. Thompson*, 446 F.3d 335 (2d Cir. 2006) (*Handberry II*), for the primary proposition that correctional institutions must provide IDEA-eligible students with a FAPE.

In opposition, Defendants argue that Plaintiff's IEP was appropriately modified within the meaning of 20 U.S.C. § 1414(d)(7)(B).  They characterize that Plaintiff received study packets "individualized for his educational level" and was afforded the opportunity to speak with a teacher and solicit additional, direct instruction as needed.  (Doc. 39, pp. 9-10).  They advance that the district court in the *Handberry* case approved of cell study coupled with the opportunity for direct

instruction as a means to educate inmates in disciplinary custody.  *See Handberry v. Thompson*, 219 F. Supp. 2d 525, 544-45 (S.D.N.Y. 2002) (*Handberry I*). Defendants also cite *S.H. v. Stickrath*,[8] a case involving youth incarcerated at juvenile detention facilities who, pursuant to a Stipulation, objected to educational services provided in the facilities' special management units.  Defendants draw our attention to the Report and Recommendation of a Special Monitor in that matter, *see S.H. v. Stickrath*, 04-cv-1206, 2010 WL 6463874 (S.D. Ohio Oct. 6, 2010), in which he suggests that students who are required to remain in their rooms during educational instruction receive Individual Course Prescriptions and have qualified teachers available to provide assistance.  *See id.* at *13.

Defendants additionally argue that Plaintiff presents an actual security threat that could not be accommodated by any method other than in-cell study.  They reference his long list of infractions while in prison, including multiple instances of physical violence, which they believe proves that Plaintiff poses a security risk every time he is removed from his cell.  Citing the testimony of various prison personnel, Defendants maintain that Plaintiff was able to control his conduct and purposely chose to re-offend, securing his place in the RHU despite ample

---

[8]  Defendants cite the matter as "*Stickrath v. Tom* (S.D. Ohio No. 04-1206, filed Oct. 6, 2010)."  Based on the case number and filing date, presumably they are referencing *S.H. v. Stickrath*, 04-cv-1206, 2010 WL 6463874 (S.D. Ohio Oct. 6, 2010).

opportunity to reduce his disciplinary custody.  (NT 35-36, 150-51).  Defendants

argue against Plaintiff's analogy that because he could receive out-of-cell health

treatment, he could likewise receive outside educational instruction.  They contrast

that adequate medical care is a constitutional mandate pursuant to the Eighth

Amendment and also that, in appropriate instances, such care may be facilitated by

means of restraints and/or sedatives, safety measures that are not conducive to

receiving educational instruction.  They further reason that, unlike the IDEA, the

Eighth Amendment does not contain a security exception.

Defendants emphasize their opposition to Dr. Kachmar's opinion that

Plaintiff could receive instruction in a separate secure area, like the institution's

visiting room.  They highlight the affidavit of the DOC's chief psychologist, who

observed that Dr. Kachmar is not qualified to render a judgment on prison security

and provided his own opinion that Plaintiff could not receive educational services

in the type of setting described by Dr. Kachmar.  (Doc. 25-1, p. 2).  In addition, the

affidavit of SCI-Pine Grove's Superintendent relates that any time a highly

assaultive inmate like Plaintiff is out of his cell, the danger to staff and others

increases and that, in any event, escorting Plaintiff using the two-officer protocol

would be an administrative burden. (Doc. 25-2, p. 2).

Finally, Defendants note their overriding statutory and constitutional

obligation to protect the public and inmates under their supervision.  They stress that they as prison administrators must be afforded deference and discretion in fashioning institutional policies to maintain discipline, order, and safety.  (Doc. 39, p. 16 & n.4 (citing *Bell v. Wolfish*, 441 U.S. 520, 547 (1979)).

We start by examining the text of § 1414(d)(7)(B) itself.  *See In re Phila. Newspapers, LLC*, 599 F.3d 298, 304 (3d Cir. 2010) ("It is the cardinal canon of statutory interpretation that a court must begin with the statutory language."). Where the language of a statute is clear and unambiguous, we apply it as written, and our inquiry is complete.  *See Marmon Coal Co. v. Director, Office of Workers' Comp. Progs.*, 726 F.3d 387, 392 (3d Cir. 2013).

Section 1414(d)(7)(B) of the IDEA embodies several predicate conditions before an IEP may be modified.  As a general prerequisite, and undisputed here, an IDEA-eligible student must have been convicted as an adult under state law and incarcerated in an adult prison.  *See* 20 U.S.C. § 1414(d)(7)(B).  In addition, the state must have demonstrated a bona fide security or compelling penological interest that cannot otherwise be accommodated.  *See id.*  Per the plain language of the statute, only after these limitations have been met is it permissible for an IEP Team to modify a student's IEP.

Use of the adjective "bona fide" indicates that any security interest must be

actual or genuine to the student, as opposed to theoretical.  More than that, the

established safety concern must be of such a quality that it "cannot otherwise be

accommodated."  The use of the word "otherwise" in this restrictive clause signals

that, where possible, a bona fide security interest should be addressed by means

other than modifying a student's IEP.  In other words, a student's IEP must be

implemented as drafted where a bona fide security interest exists and can be

accommodated.

Although we find no case law examining this provision[9] – and the parties

_____

[9]  The most relevant authority this Court uncovered predates the promulgation of §
1414(d)(7)(B), so is of little use in our interpretative efforts.  Even so, the matter of *New
Hampshire Department of Education v. City of Manchester*, No. 94-573 (D.N.H. March 21,
1996), is worth mention.  In that case, an IEP calling for 5.25 hours of daily instruction and
counseling was developed for an eligible inmate while he resided in the general prison
population of an adult institution.  *See id.* at 2, 4.  The student was later moved to the facility's
RHU after accumulating multiple disciplinary citations.  *See id.* at 5.  While housed in the RHU,
the inmate did not receive educational services in compliance with his IEP but did participate in
certain educational programs and met with a teacher once a week to review previous assignments
and obtain new ones to be completed in his cell.  *See id.*  The inmate thereafter challenged that
the prison was violating the IDEA by not providing him with a FAPE in compliance with his
IEP, and a hearing officer ruled in his favor, directing the prison to implement the IEP as-written
within the RHU.  In an exceedingly thoughtful and well-reasoned decision, and without the
benefit of § 1414(d)(7)(B), the district court identified that the issue was not whether the inmate
was entitled to a FAPE – a given under the statute – but whether he was entitled to the specific
educational program developed for him prior to his disciplinary custody.  *See id.* at 16.  The court
cogently observed that "the tail of [the student's] IEP cannot wag the dog of his prison sentence,"
explaining that he was "not entitled to an IEP which effectively insulates him from prison
discipline and control, particularly if a different IEP could be developed which might serve both
his educational needs and the prison's valid security and disciplinary interests, or at least one that
did not undermine legitimate penological interests."  *Id.* at 18.  The court ultimately tasked the
parties to develop a new IEP in recognition that "[l]egitimate prison interests must be accorded
significant deference and the IEP must be modified to the extent possible, with a view toward
striking the appropriate balance necessary to vindicate both penological and educational interests

point to none – our interpretation harmonizes with the Department of Education's

commentary on the pertinent regulations.  As the Department explains,

> The requirement that the student's IEP team make an
> individualized determination regarding modifications to
> IEP or placement are clearly stated in the regulations.
> This requirement ensures that a team of professionals
> with knowledge about the student will be able to weigh
> the request of the State and make an individualized
> determination as to whether the State has demonstrated a
> bona fide security or compelling penological interest. In
> addition, the IEP team would need to consider possible
> accommodations of these interests and only decide to
> modify the IEP or placement in situations where
> accommodations are not possible. This provision also
> allows the State to address any issues specific to persons
> alleged of committing heinous crimes.

Assistance to States for the Education of Children With Disabilities and the Early

Intervention Program for Infants and Toddlers With Disabilities, 64 Fed. Reg.

12406-01, 12577 (March 12, 1999) (FAPE Requirements for Students with

Disabilities in Adult Prisons (§ 300.311)).  The Department clarifies that the

provision permits the IEP Team to make "temporary modifications" to an IEP, but

does not impact on a student's fundamental eligibility for services.  *Id.*  The

commentary further notes that the statute purposely does not provide a definition

---

to the extent those interests can be reconciled and harmonized." *Id.* at 26.  While §
1414(d)(7)(B) provides the clear directive that a student's IEP may be modified only where the
prison's legitimate security or penological interests cannot otherwise be accommodated, the
measured approach of *City of Manchester* manifests a similar synthesis, which we find
instructive here.

of "bona fide security or compelling penological interest" based on the "individualized nature of the determination and the countless variables that may impact on the determination." *Id.* However, the Department specifies that a state's interest in conserving funds or administrative convenience does not constitute a compelling penological interest. *See id.*

Applying § 1414(d)(7)(B) to the instant matter, Defendants have amply shown a bona fide security interest. Plaintiff's disciplinary record while incarcerated is prolific. His failure to obey rules and direct orders inherently endangered personnel and other inmates. And, certainly, Plaintiff's verbal threats and multiple assaults on others engendered real and serious safety concerns.[10]

Whether the actual security threat posed by Plaintiff could be otherwise accommodated vis-à-vis his existent IEP (of May 8, 2009), is a separate question. There is no evidence that Plaintiff's IEP Team considered possible

---

[10] In the interest of thoroughness, we briefly address whether Defendants have shown a compelling penological interest, although they do not advance an argument in this respect. As the Hearing Officer noted, there is some evidence that Plaintiff was manipulative and that the prison had a penological interest in not rewarding such conduct. (*E.g.*, NT 37). However, a student's entitlement to a FAPE under the IDEA is not a privilege to be revoked in the interest of discipline. Further, to the extent fiscal considerations or administrative convenience were raised as precluding implementation of Plaintiff's IEP (*e.g.*, Doc. 25-1, pp. 2-3), those justifications are unavailing as previously stated. *See* Assistance to States for the Education of Children With Disabilities, 64 Fed. Reg. 12406-01, 12577. Thus, on this record we cannot conclude that Defendants have demonstrated a compelling penological interest pursuant to 20 U.S.C. § 1414(d)(7)(B).

accommodations to address the particular security risk unique to Plaintiff.  Rather, the record abundantly reflects that SCI-Pine Grove imposed upon Plaintiff the blanket policy that it applied to all RHU inmates, requiring cell study.  (*E.g.*, NT 81 ("[Plaintiff] received cell study according to our protocol and our protocol is based on the security protocol of our institutions.")).  While an inmate's placement in the RHU may provide strong evidence of a security threat that cannot otherwise be accommodated, we read the IDEA to require an individualized determination. Such individualized determination simply did not occur in this instance.

That being said, it would seem likely that Plaintiff's IEP of May 8, 2009, would have to yield to the state's bona fide security interest.  That IEP was developed for Plaintiff while he was imprisoned in Lackawanna County Prison. There is no indication that he was in disciplinary custody during that time and, also, his IEP appeared to contemplate his participation in general education classes.  Considering Plaintiff's assaultive conduct, not even Plaintiff argues that his IEP should include education in a group setting.  For this and other reasons, it seems probable that Plaintiff's IEP would have been subject to modification.

Finally, assuming *arguendo* the demonstration of a nonaccommodable bona fide security interest, the question remains whether Defendants "modif[ied]" Plaintiff's IEP within the meaning of the statute.  To reiterate, the IDEA permits a

27

student's IEP Team to "modify the child's IEP or placement notwithstanding the requirements of sections 1412(a)(5)(A) of this title and paragraph (1)(A)" if the state proves the requisite security or penological interest.  20 U.S.C. § 1414(d)(7)(B).  As noted, § 1412(a)(5)(A) requires children with disabilities to be educated with children who are not disabled to the maximum extent possible. Section 1414(d)(1)(A) defines the necessary content of an IEP to include, *inter alia*, a statement of a child's present levels of academic achievement and functional performance; measurable annual goals, including academic and functional goals; a description of how progress toward annual goals will be measured; and a statement of the special education and related services and supplementary aids and services to be provided to the child.

As described by Plaintiff, the term "modify" means to alter partially or amend.  When read in context, the statute sanctions amendment of a student's IEP commensurate with legitimate, otherwise-nonaccommodable security concerns. We do not read this provision as giving carte blanche to denude an IEP of special education services, as such interpretation would conflict with the plain meaning of the term "modify."  While the provision teaches that special education services must yield to legitimate safety considerations, it specifies that an education program should be revised, not annulled, in light of these interests.

We agree with Plaintiff that his IEP was not "modif[ied]" within the meaning of 20 U.S.C. § 1414(d)(7)(B).  The IEPs developed at SCI Pine Grove included no academic goals. The only functional goal related to rule compliance and was arguably unmeasurable.  The IEP was also devoid of special education and related services and supplementary aids and services.  In our view, an IEP that includes no academic objectives and no special education services whatsoever is no IEP at all, offering negligible educational benefits at best.  In short, the SCI-Pine Grove IEPs complied with neither the letter of the IDEA, permitting "modif[ication]" of an IEP, nor the spirit, which seeks to provide children with disabilities a free appropriate public education that emphasizes special education services and prepares them for further education, employment, and independent living.  20 U.S.C. § 1400(d)(1)(A).

In sum, we find that SCI-Pine Grove violated the IDEA by failing to make a particularized determination that the security interest specific to Plaintiff could not otherwise be accommodated and, moreover, by effectively nullifying Plaintiff's IEP and not providing a FAPE.  We grant Plaintiff's motion for judgment on the supplemented administrative record on this ground.[11]

---

[11]  In failing to provide Plaintiff with a FAPE, Defendants have also violated the RA and ADA.  *See C.G. v. Pa. Dept. of Educ.*, 734 F.3d 229, 235 (3d Cir. 2013).

We pause to emphasize, however, that our granting of Plaintiff's motion is not an endorsement that he should have received instruction outside of his cell. As Defendants correctly advance, courts are especially deferential to prison authorities when it comes to policies and practices instituted to preserve order and discipline and uphold security. *See Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 621 F.3d 296, 302 (3d Cir. 2010). As a court of law, our expertise is not in the provision of special education or prison management, and it is not for us to determine the particular environment in which instruction should take place or the means of delivery. We merely find that the education program Defendants provided to Plaintiff was deficient under the IDEA.

### C.   Remedy of compensatory education

We next consider Plaintiff's claim that he is entitled to the equitable remedy of compensatory education. A student's right to compensatory education "accrues when the school knows or should know that the student is receiving an inappropriate education." *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 249 (3d Cir. 2012) (quoting *P.P. ex rel. Michael P. v. West Chester Area Sch. Dist.*, 585 F.3d 727, 739 (3d Cir. 2009)) (internal quotation marks omitted). In such a case, where the school district knows or should know that a child has an inappropriate IEP or "is not receiving more than a *de minimis* educational benefit," the school is

30

obligated to correct the deficiency. *D.F. v. Collingswood Borough Bd. of Educ.*, 694 F.3d 488, 499 (3d Cir. 2012) (quoting *M.C. ex rel. J.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 397 (3d Cir. 1996)). "[I]f it fails to do so, a disabled child is entitled to compensatory education for a period equal to the period of deprivation, but excluding the time reasonably required for the school district to rectify the problem." *Id.*; *see also Jana K.*, 39 F. Supp. 3d at 608 ("[T]he appropriate and reasonable level of reimbursement will match the quantity of services improperly withheld throughout that time period, unless the evidence shows that the child requires more or less education to be placed in the position he or she would have occupied absent the school district's deficiencies."). Even though a student has attained the age of 21 and is no longer entitled to services under the IDEA, *see* 20 U.S.C. § 1412(a)(1)(A), he may yet be awarded the equitable remedy of compensatory education. *See Ferren C. v. Sch. Dist. of Phila.*, 612 F.3d 712, 718 (3d Cir. 2010).

Plaintiff argues that he is due compensatory education because he received no meaningful education services while housed in the RHU. He explains that he should receive full days of compensatory education, as opposed to partial days, because his academic, social, emotional, and behavioral disabilities affected his entire day and were not addressed whatsoever while in the RHU. He believes this

would amount to five hour and 45 minute school days on a 12 month schedule, according to the DOC's academic calendar.  (NT 112, 170-71).

Defendants contend that an award of compensatory education would undermine the DOC's rehabilitative mission.  Defendants submit that "ordering compensatory education in a case such as this one, where the lack of desirable progress is due not to the failure to accommodate a learning disability, but to an antisocial personality disorder, runs counter to the Department's rehabilitative philosophy that inmates must take personal responsibility for their behavior and that bad behavior is not rewarded." (Doc. 39, p. 17).  They further cite that a student's absences from school may undercut his claim for compensatory education, *see Gill v. District of Columbia*, 770 F. Supp. 2d 112, 117 n.4 (D.D.C. 2011), as well as a parent's obstruction of the development of an IEP, *see French v. N.Y. State Dept. of Educ.*, 476 F. App'x 468, 472 (2d Cir. 2011), likening that Plaintiff, through his conduct, precluded himself from a more favorable educational experience.  Lastly, Defendants caution that an award of compensatory education would send a clear message to other IDEA-eligible inmates that, by misbehaving and remaining in disciplinary custody, you can receive a private tutor upon your release from prison.

Plaintiff is deserving of compensatory education.  Plaintiff's IEP contained

no meaningful academic or functional goals, and the record is clear that the cell

study program, as implemented, offered no more than a *de minimis* educational

benefit.  *See D.F.*, 694 F.3d at 499.  Tellingly, Defendants do not argue against

this conclusion.

Defendants' argument that Plaintiff bears responsibility to engage

appropriately and invest in his own rehabilitation is well taken but not

determinative.  Undeniably, it was Plaintiff's volitional acts that resulted in his

placement in the RHU and, concomitantly, his restricted educational opportunities.

However, appropriate education under the IDEA is not a privilege to be taken

away, and, on the equities, it was Defendants' utter failure to provide Plaintiff with

a FAPE that engenders an award of compensatory education.  To Defendants'

concern that other inmates will seek compensatory education upon release from

the RHU, simply stated, future litigation can be minimized by complying with the

requirements of the IDEA.

## V.     CONCLUSION

More than 60 years ago, our Supreme Court pronounced education to be

"the very foundation of good citizenship," expressing doubt "that any child may

reasonably be expected to succeed in life if he is denied the opportunity of an

education."  *Brown v. Bd. of Ed.*, 347 U.S. 483, 493 (1954).  For young people

already at the margins, due to disability and interface with the criminal justice system, the importance of education as a means to recast one's future and enhance life choices cannot be gainsaid.  And yet, youth with disabilities, who are incarcerated at disproportionate rates, often are denied their right to an appropriate education while institutionalized.[12]

To be sure, these are young people whose own actions have propelled them into correctional custody.  In Plaintiff's case, his conduct has earned him multiple hash marks on his criminal record and, at 16 years-old, landed him in the disciplinary unit of an adult prison.  He stayed in the RHU long-term as a consequence of his many infractions, and the security threat that he presented should not be diminished.  Nevertheless, like all IDEA-eligible students, he was still entitled to an appropriate education.  It is incumbent on the correctional institution to provide its disabled students with an opportunity for significant learning, and this obligation is not obviated by a student's disciplinary status.

The denial of appropriate education undoubtedly serves to perpetuate a vicious circle of incarceration for this at-risk population.  It is this Court's hope that the provision of a meaningful educational benefit may yet interrupt it.

---

[12] *See generally* Elizabeth Cate, *Teach Your Children Well: Proposed Challenges to Inadequacies of Correctional Special Education for Juvenile Inmates*, 34 N.Y.U. REV. L. & SOC. CHANGE 1, 10-11 (2010).

An appropriate Order shall issue.